Jason Castle, Esq. (Attorney ID: 277222019)
**THE CASTLE FIRM, LLC**
50 Park Place
Suite 900
Newark, NJ 07102
T: (201) 371-3368
F: (973) 761-2203
Attorneys for Petitioner, Ariel St. Paul

| | | |
|---|---|---|
| **ARIEL ST. PAUL,** | | Case No.: |
| | Plaintiff, | **COMPLAINT FOR DECLARATORY JUDGMENT, FINES, RESCISSION AND REIMBURSEMENT OF ATTORNEY FEES** |
| v. | | |
| **OWNBACKUP INC.,** | | |
| | Defendant. | |

Plaintiff, Ariel St. Paul ("Ms. St. Paul") by way of complaint for declaratory relief alleges as follows:

## <u>INTRODUCTION</u>

1.      Pursuant to 28 U.S.C. § 2201, Ariel St. Paul brings this action for Declaratory Judgment, Rescission, Fines and for Reimbursement of Attorney Fees and such other relief as may be just and equitable.

2.      This complaint arises out of a pattern and practice of defendant, OwnBackup Inc. (hereafter "Own") to surreptitiously include unlawful and unenforceable noncompete language in the employment agreements the company imposes on its employees in violation of New Jersey common law and the Sherman Antitrust Act, 15 U.S.C. § 1 and which are intended to stifle competition and create a monopoly on its employees. Ironically, this unlawful business practice by Own is argualbly an effort by the company to "own" its employees post termination by tying them into unlawful noncompete contracts.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff, Ariel St. Paul is an individual residing in Newark, New Jersey.

4.      Defendant, OwnBackup, Inc. is a corporation incorporated in New Jersey with its principal place of business in Englewood Cliffs, New Jersey.

5.      This litigation is a civil action over which this Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §1332.

6.      This Court has personal jurisdiction as specifically agreed to by the parties in the *Employee Proprietary Information and Inventions Agreement* (fully executed on October 3, 2023) which set forth that any legal action or proceeding relating to the Agreement shall be brought exclusively in the state or federal courts located in Bergen County, New Jersey, and that each party consented to the jurisdiction thereof.

## FACTUAL BACKGROUND

7.      On September 27, 2023, Ariel St. Paul was extended an offer of employment from Own for the position of Corporate Events Manager. In the role of Corporate Events Manager, Ms. St. Paul was not privy to confidential trade secrets, customer account information, or customer financial information.

8.      On September 28, 2023, Ms. St. Paul electronically signed three documents sent to her by Own seeking her electronic signature via DocuSign:

   a.   an *Offer Letter* (**Exhibit A**) dated September 27, 2023, offering employment with OwnBackup Inc. which included among other things, a salary of $105,000 per year with option to purchase 940 Ordinary Shares of the Company under the Company's 2016 Share Option Plan, and a start date of October 16, 2023;

      b.   an *Acceptable Use Policy*; and

      c.   an *Employee Proprietary Information and Inventions Agreement*. (**Exhibit B**)

9.     Under Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* was the following restrictive covenant:

> d.  **After Termination.** <u>For the period of twelve (12) months immediately following termination of my employment with the Company (for any or no reason, whether voluntary or involuntary), I will not directly or indirectly:</u> (i) Cause any person to leave their employment with the Company Group; (ii) Solicit any Business Partner; or (iii) <u>act in Any Capacity in or with respect to any Competing Business located within the State of New Jersey, the rest of the United States, or anywhere else in the world. The foregoing time frames shall be increased by the period of time from the commencement of any violation of the foregoing provisions until such time as I have cured such violation.</u>
> (Emphasis added.)

(*See* **Exhibit B**)

10.    On October 16, 2023, Ms. St. Paul began a full-time position as Corporate Events Manager at Own and thereafter worked for the company for 5 months and 1 week until she was summarily terminated to no fault of her own and after the company encountered financial constraints.

11.    On March 22, 2024, Ms. St. Paul attended a scheduled virtual meeting via Zoom with her supervisor, Catherine Morgenstern, Director, Corporate Marketing/Communications which had originally been planned to discuss the logistics and execution of upcoming corporate conferences. Upon entering the Zoom meeting Ms. St. Paul was met by (1) Ms. Morgenstern and (2) Maggie Feinberg, Human Resources Business Manager for Own.

12.     Ms. Mortgenstern began the meeting by informing Ms. St. Paul that as a result of a decision made "very recently" to eliminate the position of Corporate Events Manager, Ms. St. Paul's employment with Own was being terminated, "effective immediately." Following a parade of compliments from Ms. Mortgensen regarding Ms. St. Paul's contributions to the company Ms. Mortgenstern turned over the meeting to Ms. Feinberg.

13.     Ms. Feinberg thereafter stated to Ms. St. Paul, "*We will be offering you two weeks' severance pay in exchange for your signature on a separation agreement.*" Additionally, Ms. Feinberg reminded Ms. St. Paul that she was bound by a restrictive covenant by stating: "*When you joined us, you signed a PIA agreement. So, it just means you cannot compete with OWN and you cannot solicit OWN employees.*"

14.     On March 26, 2024, and in response to a request made by Ms. St. Paul during a post-termination telephone conversation asking for a list of Own's competitors, Ms. Feingerg sent the following text message:

> **Maggie:**
> Regarding the competitor list, this is not something we provide. If you are unclear, if somewhere you want to apply/interview with you can reach out and I can confirm.

(*See* **Exhibit C**, Text messages between Ariel St. Paul and Maggie Feinberg)

15.     On March 28, 2024, Ms. St. Paul made outreach to Ms. Fienberg via text regarding her restrictive covenant. The text conversation was as follows:

> **Ariel:**
> Hi Maggie, I was going over the agreement and I have some concerns about the non-compete. Is there any list that can be provided stating where I can and cannot work? The concern is, signing this, without any knowledge, puts me at risk to thin end up in a

place that may not be a competitor today, but could be in the near future.

**Maggie:**
As discussed, we do not have a list to provide to you. If you have a question/concern about a specific company please let me know.

**Ariel:**
Thank you, I totally understand that, **but what happens if I apply to a job, get it and it ends up being a competitor post hiring** (Emphasis added.)

**Maggie:**
**Then you'd be in violation of the noncompete.** To avoid that please feel free to reach out if you think a company may be a competitor. (Emphasis added.)

(*See* **Exhibit C**, Text messages between Ariel St. Paul and Maggie Feinberg)

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

16.     Ms. St. Paul repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

17.     Plaintiff seeks declaratory judgement that the restrictive covenant within Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* is unenforceable as a matter of law in the State of New Jersey.

18.     The New Jersey Supreme Court has established a three-pronged test to determine if a non-compete agreement is unlawful.[1] In determining the reasonableness of a restrictive covenant, the test is as follows:

---

[1] *See* Solari Industries, Inc. v. Malady, 264 A.2d 53, 57 (N.J. 1970); Whitmyer Bros., Inc. v. Doyle, 274 A.2d 577, 580 (N.J. 1971).

a. The covenant must be no more restrictive than is necessary to protect the "legitimate interests of the employer";

b. The covenant must impose "no undue hardship on the employee";

c. The covenant must not be "injurious to the public interest."

19.     Moreover, the New Jersey Appellate Division has determined that an employer has a legitimate interest in protecting customer relationships, trade secrets, and confidential business information.[2]

**A. Section 4(d) Is More Restrictive Than Necessary To Protect The Legitimate Interest Of Own.**

20.     Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* violates the first prong of the reasonableness test because the language of the restrictive covenant is more restrictive than necessary to protect the legitimate interest of Own.

21.     A non-compete will be held unenforceable where the primary purpose is clearly its anticompetitive effect and where the employer did not condition signing on consideration logically related to a recognized legitimate interest.[3] Here, the language within Section 4(d) is clearly anticompetitive in effect as it places a moratorium on an employee from working for any "**Competing Business**" in "**Any Capacity**" regardless of the position of the employee held at Own.

22.     Further, Section 4(d) violates the first prong of the reasonableness test as it relates to Ms. St. Paul specifically, because Ms. St. Paul was employed by Own as a Corporate Events Manager. In that capacity, Ms. St. Paul was not privy to Customer relationships, Trade secrets,

---

[2] *See* Coskey's Television & Radio Sales & Serv., Inc. v. Foti, 253 N.J. Super. 626, 636 (App. Div. 1992).)

[3] Coskey's, 253 N.J. Super. at 635-36; ADP, LLC v. Rafferty, 923 F.3d 113, 123 (3d Cir. 2019).

and/or Confidential business information. As such, Own has no legitimate interest to protect regarding Ms. St. Paul.

### B. Section 4(d) Imposes An Undue Hardship On Own Employees

23.    When determining whether a noncompete causes undue hardship, a court considers: (i) the likelihood that the employee will find other work in the employee's field; and (ii) the restriction's burden on the employee.[4]

24.    Section 4(d) imposes an undue hardship on Own employees because it reduces the likelihood that the employee will find other work in the employee's field or any other field. Section 4(d) prohibits an employee from "act[ing] in **Any Capacity** in or with respect to **any Competing Business** located within the State of New Jersey, the rest of the United States, or anywhere else in the world. Moreover, the restriction places a burden on the employee to leave the industry where Own competes because acting in "Any Capacity" at "any Competing Business" constitutes a violation of the noncompete.

25.    Additionally, the hardship on the employee is compounded by the specific clarification provided by the Own Human Resources Business Manager, Maggie Feinberg whereby she informed Ms. St. Paul of the following via text message:

**Ariel:**
Thank you, I totally understand that, **but what happens if I apply to a job, get it and it ends up being a competitor post hiring** (Emphasis added.)

**Maggie:**

---

[4] <u>Cmty. Hosp. Grp., Inc. v. More</u>, 183 N.J. 36, 59 (2005)

> **Then you'd be in violation of the noncompete.** To avoid
> that please feel free to reach out if you think a company may
> be a competitor. (Emphasis added.)

(*See* **Exhibit C**, Text messages between Ariel St. Paul and Maggie Feinberg)

26.     Thus, should an employee begin working for a company that at the time of their hiring was not a competitor of Own, but then later becomes a competitor of Own post hiring, then the employee "**would be in violation of the noncompete.**" Therefore, at any point in time within a 12-months period following their termination from Own, an employee could enter a new employment relationship with a non-competitor of Own but if the company later becomes a competitor or Own during that same 12-month period, the employee "would be in violation of the noncompete." Moreover, in such an instance the undue hardship upon the employee is compounded even further by the penalty for violation set forth in Section 4(d) which states: "**The foregoing time frames shall be increased by the period of time from the commencement of any violation of the foregoing provisions until such time as I have cured such violation.**"

27.     Here, the cascading prohibitions of Section 4(d) against the employee, and potential for an employee to be penalized after being hired buy a company that is not initially a competitor of Own, but later becomes a competitor during the duration of the noncompete term, creates an undue hardship that is unlawful.

28.     Lastly, the language "**within the State of New Jersey, the rest of the United States, or anywhere else in the world**" imposes undue hardship on the employee because the territorial restriction is unreasonable. According to Own's public website, the company only has domestic offices in Englewood Cliffs (New Jersey) and San Diego (California), as well as international offices in London (England), Paris (France), Tel Aviv (Israel), and Hyderabad (India). Of the 195 countries in the world currently, the Own restrictive covenant restricts its

employees from working for any competitors, any place in the world, and for a period of 12-months because it maintains a presence in a *mere* five (5) countries globally. As written Section 4(d) creates an undue hardship because prohibiting an employee from working for a competing business anywhere in the world is unreasonable.

**C. Section 4(D) Is Injurious To The Public Interest.**

29.    The restrictive covenant in Section 4(d) is injurious to the public interest. Section 4(d) restricts the employees' freedom to pursue their livelihood after leaving Own by limiting their opportunities and having the potential to hinder innovation.

30.    Section 4(d) prohibits an employee from "act[ing] in **Any Capacity** in or with respect to **any Competing Business**…" This limitation not only limits the opportunities available to the employee in the field where Own benefited from that employee's knowledge and expertise, but it also stifles the employee's ability to grow within the industry even in a different professional capacity, thereby impeding the employee's career advancement and stifling their creativity which ultimately leads to dampening competition and hampering industry growth.

31.    Further, Section 4(d) is injurious to Ms. St. Paul specifically because it hinders her ability as a marketing professional to leverage her skills and expertise in the industry and restricts her career mobility and limits job opportunities. In an ever-evolving field like marketing, where innovation and creativity drive success, Section 4(d) stifles Ms. St.  Paul's individual growth and dampens competition who might benefit from her knowledge and expertise. Section 4(d) discourages Ms. St. Paul from freely moving between companies and impedes the flow of her ideas and the sharing of best practices which has the potential to ultimately hamper industry progress. Rescinding Section 4(d) would foster a more vibrant and innovative marketing landscape, benefiting professionals, businesses, and consumers alike.

32.     The determination that a restrictive covenant is reasonable does not require that it violate each prong of the three-prong, however, in this instance the noncompete language of Section 4(d) violates all three and is unenforceable as a matter of law.

33.     Accordingly, Plaintiff is entitled to a declaration that Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* is unenforceable as a matter of law in the State of New Jersey.

## SECOND CAUSE OF ACTION

### (Declaratory Relief)

33.     Ms. St. Paul repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

34.     Plaintiff seeks declaratory judgement that the restrictive covenant within the *Employee Proprietary Information and Inventions Agreement* violates the Sherman Act, 15 U.S.C. § 1 and is illegal as a matter of law.

35.     The Sherman Act sets forth:

> **Every contract**, combination in the form of trust or otherwise, or conspiracy, **in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.** Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.[5] (Emphasis added.)

---

[5] 15 U.S.C.S. § 1 (LexisNexis, Lexis Advance through Public Law 118-46, approved March 22, 2024, with a gap of Public Law 118-42)

36.     The Act prohibits "[e]very contract…in restraint of trade or commerce among the several States…" Despite the broadness of this language, the Supreme Court has recognized that Congress intended only to "outlaw ... unreasonable restraints."[6] In order to state a claim under Section 1, a plaintiff must allege (1) a contract… (2) in unreasonable restraint of trade or commerce; (3) affects interstate commerce among the States or foreign nations.[7]

37.     Here, (1) the *Employee Proprietary Information and Inventions Agreement* is a contract; (2) Section 4 (d) of the contract specifically imposes an unreasonable restraint of trade through its express language prohibiting an employee from working for "**any Competing Business**" in "**Any Capacity**" and "**For the period of twelve (12) months immediately following termination**"; and (3) it restrains commerce among the States and foreign nations by restricting an employee from engaging in *career mobility* "within the State of New Jersey, **the rest of the United States, or anywhere else in the world."** The inclusion of the language "the rest of the United States, or anywhere else in the world" unambiguously creates a restraint of trade or commerce among the several States and with foreign nations. Therefore, Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* violates Section 1 of the Sherman Act, 15 U.S.C. § 1 and pursuant to the language of the Act, "**is hereby declared to be illegal.**"

## THIRD CAUSE OF ACTION

### (Recission)

38.     Ms. St. Paul repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

---

[6] *Texaco Inc. v. Dagher,* 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006).
[7] *See* 15 U.S.C. § 1; *Am. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 788 (9th Cir.1996).

39.     Upon information and belief, Own has engaged in a pattern and practice of imposing the *Employee Proprietary Information and Inventions Agreement* on its employees at-large.

40.     For the reasons articulated above Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* is (1) unenforceable as a matter of law in the State of New Jersey; and (2) violates Section 1 of the Sherman Act, and thus pursuant to the language of the Act, is "declared to be illegal."

41.     Therefore, the Court is compelled to issue an order declaring Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* rescinded and void *ab initio*.

## FOURTH CAUSE OF ACTION

### (Fines, Reimbursement of Attorney Fees and Expenses)

42.     Ms. St. Paul repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

**WHEREFORE**, the Plaintiff, Ariel St. Paul hereby prays the following relief:

   a.   The entry of an Order declaring that the Section 4(d) of the *Employee Proprietary Information and Inventions Agreement* which establishes a noncompete restrictive covenant is hereby unenforceable as a matter of law in the State of New Jersey;

   b.   The entry of an Order declaring that the Section 4 of the *Employee Proprietary Information and Inventions Agreement* violates Section 1 of the Sherman Act, and pursuant to the language of the Act, is illegal";

   c.   The entry of an Order declaring rescinding Section 4(d) of the *Employee Proprietary Information and Inventions Agreement*;

d.   The entry of an Order declaring that Ariel St. Paul is not bound by Section 4(d) of the *Employee Proprietary Information and Inventions Agreement*.

e.   **The entry of an Order ordering Own to pay to Ms. St. Paul a fine of $105,000**[8] **and the option to purchase 940 Ordinary Shares of Own under the company's 2016 Share Option Plan**, and pursuant to the allowable fine under the Sherman Act[9];

f.   The entry of an Order awarding Ms. St. Paul reasonable attorney fees and expenses, along with statutory and required enhancements to said attorney fees;

g.   The entry of an Order granting such other relief as may be just and equitable in the discretion of the Court.

**THE CASTLE FIRM, LLC**
Attorneys for Plaintiff, Ariel St. Paul

By:   _____**/s/ Jason Castle**_____
       Jason Castle, Esq.
       **THE CASTLE FIRM, LLC**
       Attorneys for the Plaintiff
       50 Park Place
       Suite 900
       Newark, NJ 07102
       T: (201) 371-3368
       F: (973) 761-2203

---

[8] Starting base salary of Corporate Events Manager at Own
[9] Section 1 of the Sherman Act sets forth:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, **shall be punished by fine not exceeding $100,000,000 if a corporation**, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.[9] (Emphasis added.)

# EXHIBIT A



September 27, 2023

Ariel St Paul



Dear Ariel,

OwnBackup Inc., (the "Company") is pleased to offer you employment with the Company on the terms described below.

Position.
You will start in a full-time position as Corporate Events Manager and you will initially report to Catherine Morgenstern, Director, Corporate Marketing or their designee. Your start date of employment with OwnBackup will be no later than October 16, 2023. By signing this letter, you confirm that you are available to report to work on this date, free of any contractual or other legal obligations that would prohibit you from performing your duties for the Company, such as restrictions imposed by a current or former employer.

Compensation.
You will be paid a starting base salary at the rate of $105,000.00 per year, payable on the Company's regular payroll dates and subject to all withholding and deductions as required by law.

Options.
OwnBackup will recommend to the Board of Directors (the "Board") that you be granted the option to purchase 940 Ordinary Shares of the Company under the Company's 2016 Share Option Plan. All stock option grants are subject to approval by the Board and if approved, you will receive a formal stock option agreement that will detail the terms, exercise price and vesting schedule.

Employee Benefits.

Insurance.
From your first day of employment, the Company will provide you with standard medical, dental and vision insurance benefits, subject to the terms and conditions of such plans.

Paid Time Off.
You will be entitled to take time off in accordance with the Company's Unlimited PTO Policy.

Proprietary Information and Inventions Agreement.
Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's standard Employee Proprietary Information and Inventions Agreement and our Acceptable Use Policy, which are enclosed.

Employment Relationship.
Employment with the Company is for no specific period of time.  Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause, and with or without notice and for any reason or no particular reason. Any contrary representations which may have been made to you are superseded by this offer.  This is the full and complete agreement between you and the Company on this term.  Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

www.ownbackup.com
+1 646.503.5100
940 Sylvan Avenue, Englewood Cliffs, NJ 07632



Outside Activities.
While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company.  In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

Tax Matters.

Withholding Taxes.
All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

Tax Advice.
You are encouraged to obtain your own tax advice regarding your compensation from the Company.  You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or its Board of Directors related to tax liabilities arising from your compensation.

Governing Law.
This offer letter shall be governed and interpreted in accordance with the laws of the State of New Jersey.

Entire Agreement.
This letter supersedes and replaces any prior and contemporaneous understandings or agreements, representations and warranties, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

Contingent Offer.
This offer is contingent upon satisfactory completion of background and reference checks. In addition, and as required by law, your employment with the Company is also contingent upon providing legal proof of your identity and authorization to work in the United States. This offer will be withdrawn if any of the above conditions are not satisfied.

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Employee Proprietary Information and Inventions Agreement and Acceptable Use Policy and return them to me. This offer, if not accepted, will expire at the close of business on September 30, 2023.

We look forward to having you join us on October 16, 2023.

If you have any questions regarding this offer, please reach out to Erica DeWeever.

Very truly yours,

*Alyssa Lahar*

Alyssa Lahar
Chief People Officer
OwnBackup Inc.

I have read, understood and accept all the terms of the offer of employment as set forth in the foregoing letter:

www.ownbackup.com
+1 646.503.5100
940 Sylvan Avenue, Englewood Cliffs, NJ 07632

**Own{backup}**

DocuSigned by:

*Ariel St Paul*

9DD78FAAB8C2414...

Ariel St Paul

Dated:        Sep 28, 2023

# EXHIBIT B

## OwnBackup Inc.

## EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

The following agreement (the "Agreement") between OwnBackup Inc., a Delaware corporation (the "Company", and collectively with its parents, subsidiaries and all affiliated entities now or in the future (including but not limited to OwnBackup Ltd.) - the "Company Group"), and the individual identified on the signature page to this Agreement ("Employee" or "I") is effective as of _____10/16/2023_____, the first day of my employment by the Company.  I acknowledge that this Agreement is a material part of the consideration for my employment and continued employment by the Company.  In exchange for the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **No Conflicts.**  I have not made, and agree not to make, any agreement, oral or written, that is in conflict with this Agreement or my employment with the Company. I will not violate any agreement with or the rights of any third party.  When acting within the scope of my employment (or otherwise on behalf of the Company Group), I will not use or disclose my own or any third party's confidential information or intellectual property (collectively, "Restricted Materials"), except as expressly authorized by the Company Group in writing. Further, I have not retained anything containing or reflecting any confidential information of a prior employer or other third party, whether or not created by me.

2. **Inventions.**

a. **Definitions**.  "Intellectual Property Rights" means any and all patent rights, copyright rights, trademark rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor).  "Invention" means any idea, concept, discovery, invention, development, research, technology, work of authorship, trade secret, software, firmware, content, audio-visual material, tool, process, technique, know-how, data, plan, device, apparatus, specification, design, prototype, circuit, layout, mask work, algorithm, program, code, documentation or other material or information, tangible or intangible, whether or not it may be patented, copyrighted, trademarked or otherwise protected (including all versions, modifications, enhancements and derivative works thereof).

b. **Assignment.**  To the fullest extent under applicable law, the Company Group shall own all right, title and interest in and to all Inventions (including all Intellectual Property Rights therein or related thereto) that are made, conceived or reduced to practice, in whole or in part, by me during the term of my employment with the Company and which arise out of any use of Company Group's facilities or assets or any research or other activity conducted by, for or under the direction of the Company Group (whether or not (i) conducted at the Company Group's facilities, (ii) during working hours or (iii) using Company Group assets), or which are useful with or relate directly or indirectly to any "Company Group Interest" (meaning any product, service, other Invention or Intellectual Property Right that is sold, leased, used, proposed, under consideration or under development by the Company Group).  I will promptly disclose and provide all of the foregoing Inventions (the "Assigned Inventions") to the Company Group.  I hereby make and agree to make all assignments to the Company Group necessary to effectuate and accomplish the foregoing ownership.  Assigned Inventions shall not include any Invention that is both (x) developed entirely on my own time, without use of any Company

1

Group assets, ideas or direction and (y) not useful with or related to any Company Group Interest.

**c. Assurances.** I will further assist the Company Group, at its expense, to evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights specified to be so owned or assigned. I hereby irrevocably designate and appoint the Company Group and its officers as my agents and attorneys-in-fact, coupled with an interest, to act for and in my behalf to execute and file any document and to perform all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me.

**d. Other Inventions.** If I wish to clarify that something created by me prior to my employment, which relates or may relate to the Company Group's actual or proposed business, is not within the scope of the assignment of Inventions under this Agreement, then I have listed it on Appendix A and submitted it to the Company for approval. I understand that all prior matters listed in Appendix A must be reviewed and approved by the Company in order to be considered something created by me prior to my employment and not within the scope of the assignment of Inventions under this Agreement. I understand that only once approved by the Company will any prior creations be considered created by me prior to employment. When acting within the scope of my employment (or otherwise on behalf of the Company Group), I will not use or disclose anything listed in such Appendix A.

**e. Moral Rights.** To the extent allowed by applicable law, the terms of this Section 2 include all rights of paternity, integrity, disclosure, withdrawal and any other rights that may be known as or referred to as moral rights, artist's rights, droit moral or the like (collectively, "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by the Company Group and agree not to assert any Moral

Rights with respect thereto. I will confirm any such ratification, consent or agreement from time to time as requested by the Company Group. Furthermore, I agree that notwithstanding any rights of publicity, privacy or otherwise (whether or not statutory) anywhere in the world and without any further compensation, the Company Group may and is hereby authorized to use my name, likeness, voice and image in connection with promotion of its business, products and services (including, but not limited to, in websites, presentations and advertisements) and to allow others to do so. I hereby release the Company Group and anyone working on its behalf in connection with the use of my name, likeness, voice and image.

**3. Proprietary Information.** I agree that all Assigned Inventions and all other financial, business, legal and technical information, including the identity of and any other information relating to the Company Group's employees, the Company Group's entities and its Business Partners (as such terms are defined below), which I develop, learn or obtain during my employment or that are received by or for the Company Group in confidence, constitute "Proprietary Information." I will hold in strict confidence and not directly or indirectly disclose or, except within the scope of my employment, use any Proprietary Information. Proprietary Information shall not include information that, I can document, is or becomes readily available to the public without restriction through no fault of mine. Upon termination of my employment, I will promptly return to the Company Group all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (a) my compensation records, (b) materials distributed to shareholders generally and (c) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to the Company Group's networks, telecommunications systems or information processing systems (including, without limitation, stored computer files, email messages and voice messages), and that my activity

and any files or messages on or using any of those systems may be monitored at any time without notice, regardless of whether such activity occurs on equipment owned by me or the Company Group. I further agree that any property situated on the Company Group's premises and owned, leased or otherwise possessed by the Company Group, including computers, computer files, email, voicemail, storage media, filing cabinets or other work areas, is subject to inspection by Company Group personnel at any time with or without notice.

**4. Other Obligations.**

**a. Definitions.** "Any Capacity" includes, without limitation, to (i) be an owner, founder, shareholder, partner, member, advisor, director, consultant, contractor, agent, employee, affiliate or co-venturer, (ii) otherwise invest, engage or participate in, (iii) be compensated by or (iv) prepare to be or do any of the foregoing or assist any third party to do so; provided, Any Capacity will not include being a holder of less than one percent (1%) of the outstanding equity of a public company. "Business Partner" means any past, present or prospective customer, vendor, supplier, distributor or other business partner of the Company Group. "Cause" means to recruit, employ, retain or otherwise solicit, induce or influence, or to attempt to do so. "Solicit" means to (1) service, take orders from or solicit the business or patronage of any Business Partner for myself or any other person or entity, (2) divert, entice or otherwise take away from the Company Group the business or patronage of any Business Partner, or to attempt to do so, or (3) solicit, induce or encourage any Business Partner to terminate or reduce its relationship with the Company Group.

**b. Acknowledgments.**

**i.** I acknowledge and agree that (1) the Company Group's business is highly competitive, secrecy of the Proprietary Information is of the utmost importance to the Company Group and I will learn and use Proprietary Information in performing my work for the Company Group and (2) my position may require me to establish goodwill with Business Partners and employees on behalf of the Company Group and such goodwill is extremely important to the Company Group's success and that Company Group has made substantial investments to develop its business interests and goodwill.

**ii.** I agree that the limitations as to time, geographical area and scope of activity to be restrained in this Section 4 are reasonable and are not greater than necessary to protect the goodwill or other business interests of Company Group. I further agree that such investments are worthy of protection and that Company Group's need for protection afforded by this Section 4 is greater than any hardship I may experience by complying with its terms.

**iii.** I acknowledge that my violation or attempted violation of the agreements in this Section 4 will cause irreparable damage to Company Group, and I therefore agree that Company Group shall be entitled as a matter of right to an injunction, out of any court of competent jurisdiction, restraining any violation or further violation of such agreements by me or others acting on my behalf. Company Group's right to injunctive relief shall be cumulative and in addition to any other remedies provided by law or equity.

**iv.** Although the parties believe that the limitations as to time, geographical area and scope of activity contained herein are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interests of Company Group, if it is judicially determined not to be the case, the limitations shall be reformed to the extent necessary to make them reasonable and not to impose a restraint that is greater than necessary to protect the goodwill or other business interests of Company Group.

    **v.**  The Company Group and I agree that the provisions of this Section 4, as so amended, shall be valid and binding as though any invalid or unenforceable provision had not been included.

**c.**  **As an Employee.**  During my employment with the Company, I will not directly or indirectly:  (i) Cause any person to leave their employment with the Company Group (other than terminating subordinate employees in the course of my duties for the Company Group); (ii) Solicit any Business Partner; (iii) act in Any Capacity in or with respect to any commercial activity which competes, or is reasonably likely to compete, with any business that the Company Group conducts, proposes to conduct or demonstrably anticipates conducting, at any time during my employment (a "<u>Competing Business</u>"); or (iv) enter into in an employment, consulting or other similar relationship with another person or entity that requires a significant time commitment without the prior written consent of the Company Group.

**d.**  **After Termination.**  For the period of twelve (12) months immediately following termination of my employment with the Company (for any or no reason, whether voluntary or involuntary), I will not directly or indirectly:  (i) Cause any person to leave their employment with the Company Group; (ii) Solicit any Business Partner; or (iii) act in Any Capacity in or with respect to any Competing Business located within the State of New Jersey, the rest of the United States, or anywhere else in the world.  The foregoing time frames shall be increased by the period of time from the commencement of any violation of the foregoing provisions until such time as I have cured such violation.

**5.**  **Non-Disparagement.**  As an employee and after termination, as permitted by law, I will not take any action or make any statements, written, online, or oral, public or private, including on social media, which (a) insult, belittle, depreciate, or defame the Company or Company Group; (b) may damage the Company or Company Group's good reputation; or (c) may impair the normal operations of the Company or Company Group. This Section does not in any way restrict or impede me from exercising any protected rights I may have, including rights under the National Labor Relations Act (NLRA) (to participate in Section 7 activity, file ULP charges, assist others in doing so, and otherwise cooperate with the Board's investigation process), to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by law, regulation, or order.

**6.**  **Business Opportunities.**  If I serve as an officer or director of the Company Group, I will present all business opportunities related to the Company Group's business to the Company Group and otherwise act with respect to such opportunities as required by any applicable law.  The foregoing obligation shall not be affected by any provision of the Company Group's certificate of incorporation or bylaws or other corporate document that is intended to, or may otherwise be deemed to affect, the applicable requirements of any applicable law.

**7.**  **Employment at Will.**  I agree that this Agreement is not an employment contract for any particular term.  I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause.  This Agreement does not purport to set forth all of the terms and conditions of my employment, and as an employee of the Company, I have obligations to the Company which are not described in this Agreement.  However, the terms of this Agreement govern over any such terms that are inconsistent with this Agreement, and supersede the terms of any similar form that I may have previously signed.  This Agreement can only be changed by a subsequent written agreement signed

by the Chief Executive Officer or President of the Company, or an authorized designee.

8. **Survival.** I agree that any change or changes in my employment title, duties, compensation or equity interest after the signing of this Agreement shall not affect the validity or scope of this Agreement. I agree that my obligations under Sections 2, 3, 4, 5, and 6 of this Agreement shall continue in effect after termination of my employment, regardless of the reason, and whether such termination is voluntary or involuntary, and that the Company Group is entitled to communicate my obligations under this Agreement to any of my potential or future employers. I will provide a copy of this Agreement to any potential or future employers of mine, so that they are aware of my obligations hereunder. My obligations under Sections 2, 3, 4, and 5 also shall be binding upon my heirs, executors, assigns and administrators, and shall inure to the benefit of the Company Group, its successors and assigns. This Agreement may be freely assigned by the Company Group to any third party.

9. **Miscellaneous.** Any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of New Jersey without regard to the conflict of laws provisions thereof that would result in the application of any laws other than the laws of the State of New Jersey. Any legal action or proceeding relating to this Agreement shall be brought exclusively in the state or federal courts located in Bergen County, New Jersey, and each party consents to the jurisdiction thereof. The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. Unless expressly provided otherwise, each right and remedy in this Agreement is in addition to any other right or remedy, at law or in equity, and the exercise of one right or remedy will not be deemed a waiver of any other right or remedy. If one or more provisions of this Agreement are held to be illegal or unenforceable

under applicable law, such illegal or unenforceable portion shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable. I acknowledge and agree that any breach or threatened breach of this Agreement will cause irreparable harm to the Company Group for which damages would not be an adequate remedy, and, therefore, the Company Group is entitled to injunctive relief with respect thereto (without the necessity of posting any bond) in addition to any other remedies.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY, WITH THE UNDERSTANDING THAT I EITHER (1) HAVE RETAINED A COPY OF THIS AGREEMENT OR (2) MAY, AT ANY TIME, REQUEST A COPY OF THIS AGREEMENT FROM THE COMPANY.

**COMPANY:**                                          **EMPLOYEE:**

**OwnBackup Inc.**                                    Date: _____Sep 28, 2023_____

                                                     By: _____*Ariel St Paul*_____
                                                          9DD76FAAB8C2414...

By: *Alyssa Lahar*
_____            Name: ____Ariel St Paul_____

Name: ALYSSA LAHAR                          Address: ____XXXXXXXXXX NJ XXX____

                                                     _____

Title:  CHIEF PEOPLE OFFICER                         _____

## Appendix A

### Prior Matters

*Please note that this must be submitted and approved by the Company in order to be considered a prior creation by me prior to my employment.*

Date submitted by employee: Sep 28, 2023

Employee Signature: *Ariel St Paul*

Company Approval Date: Oct 3, 2023

DocuSign Envelope ID: B799EB9A-1B21-468A-B9A8-6776C0B2E7BB

# EXHIBIT C



9:10

‹ 51

MF

Maggie ›

Friday 1:01 PM

Hi Maggie, I was going over the agreement and I have some concerns about the non-compete. Is there any list that can be provided stating where I can and cannot work? The concern is, signing this without any knowledge puts me at risk to then end up in a place that may not be a competitor today but could be in the near future.

As discussed, we do not have a list to provide to you. If you have a question/concern about a specific company please let me know.

Thank you, I totally understand that but what happens if I apply to a job, get it and it ends up being a competitor post hiring

Then you'd be in violation of the non-compete. To avoid that, please feel free to reach out if you think a company may be a competitor.

Violating will result in what? Also



iMessage



9:09

‹ 51

MF

Maggie ›

Then you'd be in violation of the non-compete. To avoid that, please feel free to reach out if you think a company may be a competitor.

Violating will result in what? Also, can you confirm the exact industry own is in so I can try to avoid it.

It's not limiting you from the industry - just working with a direct competitor

Okay. Can you explain what violating the non compete will result in? of course that's not my intent but I wanted to to really understand.

I cannot give you legal advice. Please refer to Section 19 in your agreement, which dictates what will happen if you violate the non-compete.

I will take a look. Thank you

Delivered

iMessage